Mr. Justice Walker delivered the opinion of the Court. The defendant was indicted, tried and found guilty of murder in the first degree, upon which judgment was rendered against him. Various grounds of objection are urged against the validity of the proceedings in the Circuit Court, several of which, though technical, in a case of this kind should receive the most careful consideration. For we are free to recognize and preserve unimpaired, all the safeguards which the law has thrown around tire citizen, when arraigned upon a charge involving life itself, and to give him the full benefit of them. The first ground of objection is, that seventeen, instead of sixteen, grand jurors were empannelled and passed upon the indictment under which he was arraigned and tried. This objection, if true, in fact, should have been reached by plea in abatement. It is, however, founded on a misapprehension of facts. The names of all the grand jurors are set out upon the record, but eleven of the first panel, answered to their names, and five others were returned, who being sworn and charged, composed the legal number. The next objection is, that the record does not show that this particular indictment was l’eturned into court, andordered to be filed. The statute expressly forbids such an entry, unless in cases where the defendant is in custody or out on bail. (Sec. 86, ch. 52, Dig.) The object of the statute is, to keep the defendant ignorant of the fact until he is arrested; otherwise, it would be rarely the case that a defendant could be .caught. The authorities referred to may be good under other statutes, but cannot prevail under ours. The next ground is, that the judge who presided at the trial of the cause, was the attorney for the State, at the time the indictment was found. Of this there is no proof. No objection was taken at the trial by plea, motion or otherwise; nor is there any proof that these are the same persons. The defendant’s counsel contends that we should judiciously know, who the officers of the courts are. Concede this to be true, we know that at the time that the indictment was found, A. B. Greenwood was attorney for that circuit. This knowledge only extends to him as an officer. Whether he is an intimate acquaintance, or an entire stranger, in no respect changes the case. When he goes out of office, we cease to take judicial notice of him, or to know anything of the changes of pursuit which may engage his time, and when as an incumbent of a different office, we recognize him as such; it is with no reference or connexion with his former position, nor do the names add to or detract from such knowledge. This rule has its foundation in the. necessity for its existence.— Judicial notice of officers, and of their signatures, seals of office, &c., are all necessary starting points to be taken upon faith and credit due to them, as connected with the administration of justice. As incumbents in public trust, they are known for the time being but in no other respect whatever. The true mode of reaching objections of this kind is not altogether clear. This court, in the case of Caldwell ad. v. Bell & Graham, (1 Eng. 228,) held, that suggestion or motion was necessary in in order to raise the question; and even that practice is involved in difficulty. There is no precedent for the practice, for the practice in the English courts, and it is very questioneble whether an attorney there, would not be fined for a contempt, should he propose to a judge to decide whether he was judge or not. But, however, this may be, the question is not raised here; there was no objection to the competency of the judge. We judicially know, that Judge Grenmvood is the incumbent in office in that circuit; and in the absence of evidence of his disqualification, we must hold him fully competent to preside. There is no question of law disconnected from the motion for a new trial in the case. That is solely as to whether the verdict is, or is not contrary to law and evidence. It appears, that in the month of February, 1846, in the county of Carroll, Arkansas, Lewis Williams, a resident of said county, was shot near his own house. No one appears to have been present at the time he was killed, except the wife of the deceased, and possibly her sister, who, however, was not called as a witness. So far as regards the time, place, the identity of the person killed, and his death atthehands of the defendant, there seems tobe no question. The whole contest is narrowed to an enquiry as to the circumstances under which the killing took place, and the probable motives which induced the defendant to commit the act. 'i he circumstances which most probably led to the difficulty, which terminated in the death of Williams, were connected with, or grew out of his treatment to his wife, who was the daughter of the defendant, and for them we are almost entirely dependent on her own account of the affair. She was the only witness examined on the. part of the defendant, and according to her account of the matter, was whipped, or beaten with a stick, and turned out of doors by her husband, without any other provocation than that she requested him to desist from whipping her child. She went to her father’s, staid all night, and related to her mother the occurrence; whereupon, on the next day her sister and father accompanied her to the house of deceased. The sister had been sent on in advance by the wife, to see whether her husband would permit her to return, and, whilst she was waiting by the wayside to learn the result, her father came by and learning the facts, left his gun, and went with her to the house of deceased, greeted him kindly, and inquired the cause of his ill treatment to his wife. Deceased became angry, assertedhis right to whip either his wife or child, and went out of the house, and said he was ready for defendant; that defendant drew a chair on deceased after he had .left the house. Deceased then went off, saying, that he would get Dawson’s gun, and kill defendant. Defendant started home, and before he got out of hearing, deceased returned with rocks in his hands, threatening the life of defendant and called for him. Defendant heard him and replied, “here I am.” Deceased was at that time appoaching the house, but turned, and advanced upon defendant, threatening to kill him, and refused, to put the rocks down when requested. Witness then heard the report of the gun, and started to see what was the matter, met the defendant, who told her he had shot but not to hurt the deceased, who was rushing upon him: that deceased ran towards the cliff where rocks were plenty. Witness also stated that the parties were about 15 steps apart when the gun fired. She saw deceased advancing to her the moment when the gun fired; she did not see defendant shoot; was sitting suckling her child at the time the gun fired; the parties were about 80 steps off from the house; she saw deceased run off after the gun fired. TMs is substantially the evidence of the only eye-witness to the transaction, who deposed, and the credit due to it must in some degree, depend upon its consistency as a statement of facts, and with the other evidence in the case. The State introduced two witnesses, who deposed as to different confessions made by the defendant to them. To the first, the defendant stated that he was. afraid his children had been his ruin; he was afraid he had killed deceased; that he went to the house of deceased, and inquired of him about his difficulty with his wife, whereupon he became angry, and defendant had struck at him with a chair; that deceased went out of the house, and the defendant followed him a short distance; deceased had rocks in his hands, with which he threatened defendant, who having his gun on his arm at the time, fired it off to scare the deceased; that he did not aim to hurt him, but was afraid the bullet had glanced the stable and killed him. Witness had never before heard of a difficulty between deceased and his wife. The second confession, after reciting the' circumstances which led him to the house of deceased, is, that the deceased became angry when he mentioned the object of his visit, and that the defendant drew a chair on him; that he left the house and went off; that deceased’s wife asked where he had gone, he answered, towards Dawson’s, whereupon, she said he had gone to get Dawson’s gun, and defendant had better get his gun, which he did; that deceased returned with rocks in his hands, and as he came, defendant discharged his gun to scare him, and started home. As he wont, hoard the wife of deceased and her sister screaming. The State then called some three or four witnesses, neighbors of deceased who went to the place that evening, and examined the body and the ground on which the shot took place. They all give the same account of the matter. There was snow on the ground, and they state that they could distinctly see all the tracks made by the parties. They found thedeceased’s body about 150 yards from where deceased was shot, followed the track to the place where they supposed the parties stood when thegun fired: they were about 19 steps apart and about 75 steps from the house; the tracks of both parties came from towards the house, though not directly following each other: from the tracks, it seemed that deceased had stopped behind the crib, and seemed to have walked on about 15 steps and stopped; there he was shot: it was two or three steps from there before they saw blood: the tracks of the person who, they suppose, shot deceased, did not go directly up to the crib, but came within 15 or 20 steps, and then turned back and seemed to follow the tracks of deceased until he was shot: deceased ran 150 yards off from the house towards the path to the nearest settlement; in following tho track where deceased ran, there was a rock, about two pounds in weight, which appeared to have been dropped in the snow: deceased had no weapons about him; he was shot in the lower part of the shoulder, and the ball came out in front in the lower part of the neck; there was no other wound perceived. These are the material facts in the caso; and they should be examined in a two fold point of view; first, to reconcile, if possible, the conflicting evidence of the witnesses, and to determine the credit due to the witnesses as their statements stand thus reconciled or contradicted by other evidence; and then to apply the evidence to the case under consideration. The jury had also a right to consider the weight due the evidence of a witness from the relationship which such witness bore to the parties, his or her opportunities for thorough accurate information, from the manner of deposing, whether full and circumstantial on points favorable to one side and-reluctantly as to such as are prejudicial or unfavorable to that side, as well as when the statements are improbable in themselves as existing under the known or admitted circumstances connected with them. And in this case, when the witness, the daughter of the defendant, related as the only provocation given her husband for the cruel conduct which she says followed the request on her part to desist from whipping the child, the treatment to her is so disproportionate to the offence, (if such it could be called,) that whilst it blackens the character of the deceased, if true, it invites for its unnatural enormity an increased scrutiny as to the probability of the act itself. So, the improbability that a blow, stricken with a round stick on the arm, would cut it so as to leave a scar to be seen more than four years after, without breaking the bone of the arm or so injuring it as to render it useless for a time, and have made it the subject of complaint and observation at the time, is altogether improbable, nor is it less so, that with a knowledge of the facts and threats and acts of the parties at the time the shot was receeived, that being the wife of one and the daughter of the other, she could have sat suckling her child where she could see her husband advancing upon her father, but not her father, who she knew had a gun (taken at her own suggestion, too, according to his account of the affair.) Surely, if there ever was a time when the breast of woman would refuse to yield sustenance to her offspring, it might have been for the moment suspended then. These things could not have escaped the observation of an intelligent jury. Nor is it to be presumed that they failed to remark that, without interrogatory, (so far as the record shows,) she volunteered to state that she had heard' her mother tell her father, some time before the killing, that deceased had threatened defendant’s life, thus linking a threat and its communication to the defendant in a single sentence without interrogatory and without the slightest reference to any cause or circumstance to justify it. Nor is there such throughout the whole of the evidence. On the contrary, the only witness who alludes to the previous state of feeling between the deceased and his wife, stated that he had never, before the circumstance related as giving rise to the difficulty in this case, heard of any difficulty between them. These circumstances were all calculated to cast suspicion upon the evidence of this witness, and, when the facts which she relates in several material points are flatly contradicted by other facts and circumstances, might, in the estimation of the jury, have been sufficiently strong to have induced them to reject her evidence as wholly unworthy of credit. Thus, she stated that her father drew a chair on the deceased after he had left the house. Aside from the improbability of this, the defendant’s own confessions expressly contradict it. She says that when deceased went off, defendant came in the house and told her that deceased had gone for a gun to kill him (defendant) with; defendant says, in his confession, that she told him that deceased had gone to get a gun to kill him with, and he (defendant) had better get his gun. She says that, after communicating to witness where deceased had gone, defendant started home, and answered to call of deceased when he returned; such is not the account given by the defendant. But the most important point is, that when deceased came back with rocks, he inquired for defendant, and, upon his answer, on his way home, deceased turned and advanced upon defendant with rocks; aside from the great improbability that a man who had been made to leave his own house by simply raising a chair on him, would attack the same man with a gun, with no other means of defence than rocks, it is just as impossible for her statement with regard to the fact of his advancing on the defendant to be true, as if some four disinterested spectators, placed therefor the purpose of seeing whether there was an advance or not, made by the deceased upon the defendant, had sworn that such was not the case: for, as many such, witnesses swear that they examined the tracks, that all the tracks were plain to be seen in the snow, that both the tracks of the deceasedand of him who they suppose shot him came from towards the house, though not one immediately after the other, until within some 15 or 20 steps of the crib, the tracks of the defendant or him who shot (and as to the identity of person there is no dispute) turned and followed on the track of the deceased until he was shot. The tracks of the deceased were all receding, not advancing steps. The shot was received in the back and came out in front. It was impossible that he could have been facing defendant at the instant of the shot. The statement of this witness, aside from all contradictions, was certainly untrue in this material particular, and if so, under a well recognized rule of evidence, might have been by the jury, wholly disregarded. And the defendant’s statements are not only contradictory in themselves, but flatly contradicted by these witnesses. The deceased could not possibly have been rushing upon him, as he stated in his second confession (for, in his first, he does not so state it.) It is impossible for him to have done so without the tracks having been seen by those witnesses who followed the tracks and examined the signs so closely as to notice even the falling of a rock into the snow — men who, from their residence and pursuits, it may well be presumed, were eminently fitted to detect the slightest impression made, not alone in the snow, but even the flint covered mountain sides of their neighborhood. These facts are not to be mistaken, and from them the jury were well warranted in the conclusion that the shot was made either at the time when the deceased was not aware of it, or at least not advancing to assail the defendant. He was found dead, and wholly unarmed. It is highly probable, from the circumstances, that he had a rock in his hands when shot, or otherwise there is no accounting for that apparently dropped in the snow on the way in which he ran. In view of the whole of the circumstances, it is probable that the difficulty did arise out of the treatment by the husband (the deceased) to his wife; but whether that was or not of the aggravated character related by the wife, is much to be questioned. Whether true or false, however, if credited by the defendant, and he acted under it as true, it was the same as to him if probable in itself. If the defence had been rested upon sudden passion, the feelings of an indignant father at the treatment of his daughter, and the conduct of the father had been consistent with such feelings and influences, a jury might have hesitated long whether their verdict should not have been milder in consideration of such influences. But the defendant, according to his own account of the affair, places his acts upon entirely different ground, and makes the act to follow the occurrences in the house, in which it is evident he was the principal aggressor, and even then he does not follow it up as an act under the influence of passion suddenly aroused, but of deliberation to alarm the deceased and make him throw down the rocks which ho held in his hand. The effort to make it appear the result of accident or a glancing shot not aimed, is altogether irreconcilable with the facts, aside from its inconsistency in other respects with the evidence. The shot in the back shows that the relative position of the parties could not have been such as to require it, and as all the circumstances show that time was given for passion to cool and reason resume its empire, of which it was the province of the jury to decide as well as of all the other facts and circumstances of the case, and from which they were well warranted in finding the defendant guilty of murder in the first degree. There is no question of law ruled against the defendant in the case, no improper conduct on the part of the jurors, or improper influences affecting their decision, or in any wise calculated to influence them improperly in making it. And after the most attentive consideration of the whole of the evidence before them, we are led to the conclusion that their verdict was well sustained by the evidence; and that the Circuit Court did not err in refusing to grant to the defendant a new trial in this case. The judgment and decision of the Circuit Court of Carroll county must, therefore, in all things, be affirmed, and the cause remanded, that the State may cause the judgment and sentence of the Circuit Court to be carried into execution under the provisions of the statute. Dig., p. 418, ch. 32, sec. 206, 207.